[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] ARTICULATION OF RULING ON MOTION TO QUASH
I. Nature of Proceedings
This action originated on June 23, 1994 with an application for a writ of habeas corpus filed by Charles Alfano, self-appointed "next best friend" of Julio S. (Paragraph 1, First Count, Application for Writ of Habeas Corpus) and Raymond and Nancy Orsi, proprietors of Domus Amorus, where Julio S., a multi-handicapped child born June 5, 1986, was placed by the Department of Mental Retardation (DMR) with the consent of his mother, Alba G., on February 1, 1987. The defendants are Toni Richardson, Commissioner of DMR, and the mother, Alba G.
The Orsis, who characterize themselves as the child's "foster parents", are the proprietors of a residential placement licensed as a "Permanent Family Residence" by the Department of Children and Families (DCF) housing twenty handicapped residents and staffed around the clock by professionals or para-professionals in addition to the Orsis themselves who devote full time to this facility. Although not also characterizing themselves as two additional "next best friends", they claim, as did the plaintiff Alfano, to assert rights that would otherwise be asserted by Julio himself:
 First Count, paragraph 25: Nancy and Raymond Orsi do not seek permanent custody of Julio. Rather, the applicants, Charles Alfano and Nancy and Raymond Orsi, seek to enforce rights guaranteed to Julio under the Constitution of the United States and the Constitution of the State of Connecticut, which protect him from arbitrary determination of his interests.
The plaintiffs seek the issuance of the writ so that the Court may make "such an order concerning the custody of the child as will best serve his best interest and welfare." They further seek the appointment of an attorney for Julio and both a temporary and permanent injunction CT Page 9803 enjoining the defendants from removing Julio from the Orsis' care pending the outcome of the hearing on Julio's "best interests." The plaintiffs further request the Court to retain jurisdiction in order to "supervise the drafting and implementation of statutes and regulations of the Department of Mental Retardation which comport with the due process rights of the plaintiffs and Julio. . ." [Emphasis added.] They do not specify which due process rights of the plaintiffs are involved in Julio's proposed removal from Domus Amorus.
Although filed as a regular civil matter, the application was returnable to the Family Actions docket, and is dated two days after the defendants Orsi had received a letter from Commissioner Richardson giving June 28, 1994 as the proposed date for moving Julio from the Orsis' residence to another placement approved by both DMR and the child's mother. The day after filing, on June 24, 1994, the Commissioner moved to quash the application on the ground that "the petitioner" (presumably meaning the Orsis) lacked standing to bring this habeas corpus petition since any person voluntarily admitted to DMR for out-of-home placement under § 17a-281 of the Connecticut General Statutes, may be transferred by DMR from one residential placement to another so long as the parents or guardians agree. § 17a-210 (b) Voluntary placement through DMR, according to the Commissioner, does not vest in that agency "any authority to make or create `foster parent' situations." (Memorandum in Support of Motion to Quash, p. 3). The Commissioner also argued that "next of friend" [sic] may not act when a child has a lawful guardian (the mother) and is in the "legal custody and control of a state agency", DMR.
Although the Orsis did not initially assert standing as foster parents under § 52-466 (f), the Commissioner further maintained that since Domus Amorus is licensed by DCF as a "Permanent Family Residence", not as foster home, the Orsis as the proprietors of that facility, are not Julio's "foster parents".
The matter was transferred from Family to Juvenile Matters where, on June 28, 1994, the court (Foley, J.), after examining the file, denied the motion to quash the writ "at this time", granted the issuance of the writ of habeas corpus, issued a temporary injunction enjoining the removal of Julio from the Orsi placement "pending further order of the court" and appointed a legal representative to act as both attorney and guardian ad litem for the child.
A judicial pretrial was conducted on July 19, 1994 in which all parties agreed that no hearing on the merits of the Motion to Quash would be claimed by the Commissioner until after September 1, 1994; that CT Page 9804 the child's legal representative would make an election by August 15, 1994, between seeking an administrative review of the proposed changed in placement pursuant to § 17a-210 (c) in the name of the child himself, or initiating an uncared-for petition on behalf of the child in Juvenile Matters pursuant to § 46b-129, seeking to remove his mother from guardianship as being unable to meet his specialized needs. All parties agreed to the continuation pendent lite of the temporary injunction granted June 28, 1994 by Judge Foley. In the event that the child's legal representative failed to make the above election as to which course to pursue by the date set, the Commissioner could claim a hearing forthwith on the Motion to Quash. If that motion should be denied, the parties recognized that the habeas action itself might be dismissed or abated for failure to exhaust all administrative remedies provided under § 17-210 (c).
On August 15, 1994, Julio's legal representative elected to request an administrative hearing under § 17a-210 (b) on the proposed transfer from the Orsis' residence in Plainville to a placement in Willimantic where the mother resides and informed the Court by the required date.
The initial administrative hearing with DMR was set for September 26, 1994, the Commissioner raising no objection to Julio's court appointed legal representative requesting a hearing on the proposed change of placement under subsection (c) of § 17-210. [This may account for plaintiff Alfano's absence from all subsequent proceedings in this matter, the child now having an independent advocate at both the administrative and judicial levels]. By the date of this hearing, the legal representative had secured from Dr. Sue Gant an independent evaluation of Julio's current situation with the Orsis and how he might be transitioned into living in an especially equipped home with his mother and siblings after an interim placement during which those responsible for his care could learn how to meet his needs. (Defendant DMR's exhibit A, May 4, 1995.) Over the course of the next three and one-half months, DMR secured the necessary services and equipment to permit implementation of Dr. Gant's recommendations for transitioning Julio to his mother's home. By letter of January 12, 1995 to the Orsis, Julio's legal representative outlined the proposed modified plan and invited them to join Julio, DMR and the mother in seeking to dissolve the temporary injunction and in working together to effect the transition. Through their attorney, the Orsis declined, offering instead eventually to "come up with a counter proposal." Thereafter, on February 8, 1995, the child's legal representative joined DMR and Alba G., in a motion to dissolve the temporary injunction. In a judicial pretrial conference in March, a hearing date of April 18, 1995 was set. This was later continued at the request of plaintiffs' counsel CT Page 9805 to May 4, and 5, 1995.
At the outset of the hearing on May 4, 1995, the parties presented oral argument on the Motion to Quash, with the understanding that if it were denied, they should be prepared to proceed on the habeas application to determine the child's best interests. At the opening of court, held in the Superior Court, Juvenile Matters, every available seat was filled with representatives of the public and/or press. When the court ordered the proceeding to be closed except for the parties and their representatives, the Orsis, through counsel, protested on the ground that this was a civil matter, open to the public. Their objections were overruled and the proceeding closed in the exercise of the court's discretion to exclude nonessential persons from any Family Matter. (Practice Book § 478).
After hearing oral argument, the court ruled that the Orsis lacked standing to bring a habeas matter under § 52-466 (f) or any other statute or common law rule. The Motion to Quash therefore, was granted. (See Section III below). Rather than terminating the hearing at that point, however, and being mindful of the fact that the Orsis had listed 92 proposed witnesses (including Julio himself, despite the fact that he has no intelligible speech), many of whom had been subpoenaed and were prepared to testify that day, the Orsis were invited to begin a presentation of their case in the nature of an offer of proof in the event that an appellate tribunal might find error on the ruling on standing and remand for a further hearing on the merits of Julio's "best interests." Because of the limitations of time, the Orsis were warned in advance that after a day and half of eliciting testimony from their most persuasive witnesses, the defendants would be permitted to put on two hours of testimony in rebuttal, for the purpose of determining the necessity for continuing the temporary injunction pending any appeal.
The plaintiffs called eight witnesses, including the child's pediatrician, Nancy Orsi and six child-care workers all of whom testified substantially the same, finding no specific fault with the proposed plan but predicting emotional, if not physical or medical, harm to the child should he be moved from the Orsis to any other placement at any time. DMR called another pediatrician and Alba's DMR case manager. At the conclusion of this testimony the court found that there had been offered no data previously unknown by the drawers of the plan and no specific criticism of any aspect of the proposed plan itself. There, was however, a substantial difference of predictability as to the ultimate impact on the child of any change in his placement, the plaintiffs' witnesses predicting distress to the point of death; the defendants' witnesses predicting the probability of the child's CT Page 9806 surviving the transition, although his medical fragility could result in death at any time, in any surrounding.
After finding that these differences of prediction, under these circumstances, were insufficient to rebut the presumption of parental fitness in § 46b-56b, and further finding that any proposed placement plan agreed to by the legal guardian, DMR and the child's court appointed independent legal representative could not be denied merely on a prediction of long-time caretakers, the plaintiffs were found to have failed to present a prima facie case that Julio's best interests would not be served by permitting the proposed plan to be implemented. Since it did not appear, even if judgment were to be reversed on the issue of standing and sufficient judicial time found to hear the plaintiffs' other 84 witnesses, that the outcome would be different, the motion to dissolve the temporary injunction was granted and Julio's custody returned to his mother.
It was subsequently learned that Julio had been moved and before the end of May, he died. Anticipating that an appellate court might find the issues raised as falling within the "capable of repetition but evading review" exception to the mootness doctrine, Orsi v. Sentore, 31 CA 400, 423, 426, cited with approval in footnote 10, Orsi v. Sentore230 Conn. 459, 465 (1993), this articulation is regarded as being necessary for a resolution of these issues.
II. Facts Preceding Institution of this Proceeding
Stipulations entered into on May 4, 1995, testimony and exhibits admitted into evidence on that and the succeeding day, and the record in a prior proceeding in Juvenile Matters (In re Julio S., Willimantic SCJM Docket 9313-01), of which judicial notice is taken, support the following findings of fact:
1. Julio S. was born June 5, 1986, the second of three children born to Alba G., a high school graduate with training and many years experience as a nurse's aid.
2. Julio was born with a chromosomal anomaly (the "1-P+ syndrome") resulting in multiple developmental handicaps: Born prematurely weighing three pounds, at nearly nine years he weighs only 30 pounds; he is "extremely retarded"; must be fed with a gastric tube; has high blood pressure; underdeveloped lungs necessitating the use of oxygen throughout the day, a ventilator at night, and on occasion, a nebulizer; both hearing and sight are impaired and he has no intelligible speech; his life expectancy is approximately 18 years. CT Page 9807 After trying vainly to meet his complex medical needs, which necessitated frequent hospitalizations for the seven months that he lived with her, Alba requested voluntary residential placement for him through DMR. § 17a-281. Lacking any DMR licensed facility that could address Julio's complex medical needs, or any facility in the Willimantic area capable of meeting those needs. DMR, on February 1, 1987 placed him at Domus Amorus in Plainville.
3. Domus Amorus, until shortly before institution of this action, housed 20 residents, some adopted by the plaintiffs (Orsi), and some placed with them as children committed to DCF as neglected or uncared for. Julio was neither: His mother has at all time since his birth (save for a few days in 1989 at the outset of the juvenile proceeding) retained both his legal custody and guardianship. His placement at Domus Amorus has, at all times, been a voluntary placement secured and approved by DMR pursuant to the provisions of § 17-210ff of the Connecticut General Statutes.
4. From the outset of his placement with them, the Orsis have indicated their desire to adopt Julio, notwithstanding that his mother, having voluntarily consented to his placement, has retained legal guardianship throughout his life.
5. In November of 1989, upon learning by chance, after the fact, that Julio had been hospitalized on an emergency basis, Alba withdrew her consent for his continued placement with the Orsis and demanded his return to her care. To prevent this, the Orsis requested Attorney Barbara Ruhe (their counsel in the instant matter) to obtain the court's permission to act as Julio's guardian ad litem for the purpose of filing a petition under § 46b-129 that would remove Alba as his custodian and guardian. Attorney Ruhe obtained the court's permission to do so and on the same day filed coterminously not only a petition alleging him to be an uncared-for child in that his specialized needs could not be met in the home of his parent, § 46b-120, but also a petition pursuant to § 17-43a(e) seeking to terminate Alba's parental rights so that he would be free for adoption by the Orsis. Alleged grounds for such termination were abandonment, absence of parent child relationship and parental deprivation of necessities. After vesting temporary custody in the Department of Children and Youth Services (DCYS), the then counterpart to DCF, so that he could be moved from the hospital back to Plainville, the temporary custody was vacated, Julio's custody reverting back to Alba who made no further unilateral attempt to remove him. On February 5, 1990, the petition for termination was dismissed on the ground that children not previously committed to DCYS under § 46b-129 have no standing under § 17a-43a to institute actions to CT Page 9808 terminate their parents' rights. After being transferred to Willimantic, an evidentiary hearing on the uncared for petition was held and the court (Sullivan, J.), finding the petitioner had not met his burden dismissed the petition.
6. For the next four years, Alba continued to permit Julio to remain at Domus Amorus, while working closely with her DMR case manager, Carolyn Murray, to secure an appropriate placement in or near her home in Willimantic so that he could be cared for near his two siblings and his large extended family in that city.
7. In early 1994 DCF began to investigate complaints of alleged abuse of children other than Julio residing in Domus Amorous, resulting in the following: (1) Two children committed to DCF were removed, and the Orsis began an administrative appeal of the propriety of their removal; (2) neglect proceedings were begun in regard to the children already adopted by the Orsis; and (3) proceedings were instituted administratively by DCF for the revocation of their license as a "Permanent Family Residence". None of these proceedings had been concluded as of the time of the hearing in the instant matter.
8. On June 7, 1994, the mother and a representative of DMR attempted to remove Julio from Domus Amorus to a placement approved by DMR in close proximity to the mother. At the request of the Orsis, they agreed to defer Julio's immediate removal but ten days later DMR notified the Orsis that Julio would be removed on June 28, 1994, and this proceeding followed soon after.
9. Julio was accorded standing under § 17-210 (c) to seek an administrative review of the proposed placement change through his court-appointed legal representative. Such representative was specifically authorized by this court to institute an action under §46b-129 alleging Julio to be an uncared for child if that legal representative were not satisfied with the arrangements made by DMR and approved by Alba.
10. Julio's physical condition had deteriorated in the 18 months preceding the hearing:
 — "His pulmonary status has apparently deteriorated so that now he requires a respirator during sleep and also continuous oxygen while he is awake. . . (DMR Exhibit C, P. 2)
 — The increasing size of his growing torso, in relation to his underdeveloped lower limbs, has necessitated CT Page 9809 discontinuing the brief periods when he could stand on a standing table. (DMR Exhibit 4, p. 8).
 — "He has developed increasing difficulty with allergies to environmental substances when they cause respiratory discomfort." (Ibid.)
 — "He has also recently developed allergic/hypersensitivity to certain medications. . ."(Id., p. 9).
 — "A recent incident of Julio `bottoming out' (extremely low blood pressure with no response) was the first such incident [of rapid hypoglycemia]" (Ibid).
 — "In approximately the past three (3) years, Julio has begun to bruise more easily." (Ibid).
11. Attorney Ruhe called eight of her 92 listed witnesses in the day and a half available. They all testified to the medical adequacy of the DMR plan but predicted that any transition would cause the child to be upset, resulting in respiratory distress and probable death. Invited to make an offer of proof that any of the remaining 84 witnesses would testify to any substantially different matters, none was made by the plaintiffs.
12. According to Dr. Samson, the child's pediatrician at Domus Amorus, Julio's maximum life expectancy of approximately 18 years, is more likely to be reached if he were left at Domus Amorus, although no specific defect in the alternative plan was described.
13. Dr. Pearson, the expert witness called by DMR, was for 13 years chief of pediatrics at Yale and has had extensive experience with children with chromosomal deficiencies as well as with multi-handicapped children at the Hole-in-the-Wall-Gang camp, for which he has acted as camp doctor for eight years. Asked his opinion of the remarkably similar predictions by all eight of the Orsis' witnesses with widely divergent areas of expertise he called it "as much hyperbole as if he were to say, `he'll die in three months'." Julio is a medically fragile child who has a number of potentially lethal conditions. It is impossible to give a definite prognosis concerning survival, but his situation is such that he could develop complications that could cause his death no matter where he was living — Willimantic, Bristol, Hartford Hospital or in fact, almost anywhere. (DMR Exhibit D, p. 3)
14. While all witnesses agreed that an ideal transition to any CT Page 9810 other replacement should be preceded by a long period during which Alba could learn all of the necessary care Julio needs while still at Domus Amorus, the obvious tension and hostility toward her that she perceives in that setting has a basis in fact: The Orsis attempted to terminate her parental rights in 1989 and remain critical of her motivation and ability to provide even the rudiments of his care.
15. The in-home nursing service which has provided most of Julio's care during daytime house at Domus Amorus is not available to him should he move to Willimantic, though Dr. Gant and Dr. Pearson both approved the nursing component of the proposed plan.
16. Should the license revocation hearing instituted by DCF result in the loss of license for Domus Amorus to care for handicapped children, Julio would have to be summarily removed since DMR may not place retarded children in a facility which is not licensed by DMR, DCF, or the department of public health and addiction services. § 47a-227 (3)
17. Julio bonds easily to people. At Domus Amorus there are 20 other residents and a constantly rotating staff including two assigned to Julio and two other severely handicapped children at all times, in addition to general staff and the Orsis, who have overall supervision of this facility.
III. Defendants Lack Standing to Institute This Proceeding
A. They are not in the class of foster parents granted standing under § 52-466 (f).
1. Legislative History:
Subsection (f) of the statute concerning habeas corpus actions (§52-466) was enacted as Sections 3 and 4 of P.A. 88-332. It was introduced as Amendment A to Senate Bill 288, the purpose of which was to mandate the licensing of relative foster homes for children in the custody of DCYS. Prior to the enactment of Senate Bill 288, DCYS could place children in its custody into the homes of relatives without the licensure requirements applicable to unrelated foster homes. Earlier that year' a child had been removed from a licensed foster home and placed in the home of an unlicensed relative where the child was killed. The principal purpose of the measure was to require the same kind of investigation, including access to criminal and arrest records, when the agency proposed to move a child into the home of a relative. Amendment A was introduced as an additional safeguard for children about to be moved from foster homes where they were well known into other placements, related or not. The rationale, as presented by the CT Page 9811 bill's backers (including those who had unsuccessfully represented foster parents in Nye v. Marcus, 198 Conn. 138 (1985); see discussion below), was to provide a forum where a foster parent could present to a court reasons why the exercise of the agency's discretion would not be in the child's best interests. An early attempt to broaden the amendment to give the habeas right not only to foster parents but also to "Any person other than a foster parent" was unsuccessful. The measure as passed provides:
 (f) A foster parent or an approved adoptive parent shall have standing to make application for writ of habeas corpus regarding the custody of a child currently or recently in his care for a continuous period of not less than ninety days in the case of a child under three years of age at the time of such application and not less than one hundred eighty days in the case of any other child.
In all of the testimony at hearings and in introductory remarks by legislators, it was only placement decisions by DCYS that were to be subject to scrutiny in habeas actions brought by foster parents. Nowhere in the explanatory material is there any suggestion that children who remain in the custody of their parents would be subjected to the same scrutiny and resulting delay in implementation of parental planning.
Since DCYS, under its administrative regulations, may not place a child voluntarily for more than 90 days, all children placed by DCYS under this statute must be in DCYS custody either temporarily (under Orders of Temporary Custody), for a term (under commitment) or indefinitely (when parental rights have been terminated and DCF named statutory parent but before adoption is finalized).
In introducing Amendment A to the Human Services Committee on March 1, 1988, Attorney Shelley Deballe of the Connecticut Civil Liberties Union explained that its purpose was to reverse the impact of Nye v.Marcus, supra, which had denied to foster parents the right to initiate a habeas action to question the advisability of DCYS moving a child who had been freed for adoption from their home into another home that had been approved for adoption by DCYS:
 [This amendment] seeks to broaden the currently very restrictive standards regarding who has legal standing to initiate judicial review of decisions made by DCYS regarding changes in placement of children in its care. (1988 House CT Page 9812 Proceedings, p. 305).
 You cannot presuppose that DCYS never makes mistakes. . . it's important that at some point a court be able to look at the situation and make a decision of whether DCYS is acting in the child's best interests or not. . .
 By granting foster parents standing, we are not saying that would predetermine the results of the judicial proceeding. All we're saying is that there has to be some way for a child to have a voice.
 There has to be some way for a child to have a voice and to bring this very, very important decision . . . before an impartial decision maker and not only entrust these important decisions to DCYS. (Id., p. 306.)
 If the parental rights have not been terminated, obviously the parent has superior legal status in proceeding like that, and the showing that the foster mother would have to make to overcome that would be extremely great. (Id. at 307).
It is clear from these comments, and from the stated intent to negate the impact of the Nye decision, that the purpose of Amendment A was primarily to permit a foster parent to question a DCYS placement decision when the natural parents' rights had been terminated. Secondarily, such questioning was to be permitted even when parental rights were not terminated but the burden on the foster parent in that circumstance would be "extremely great".
In introducing this bill to the House of Representatives two months later, Rep. Favreau also explained its application to children in DCYs custody:
 If an action for habeas when the DCYS wants to move the child, the foster parent who has had custody . . . can . . . file a writ of habeas. . . (Housing proceedings, p. 7296.
Later, in explaining the bill and Amendment A to the Senate, Sen. Przybsz stated:
 [It] . . . gives the Commissioner of DCYS access to arrest records and it makes various changes, as I explained previously, for the standing of foster parents and approved adoptive parents when they apply for writs of habeas corpus. CT Page 9813 (Senate proceedings, p. 2790.)
At no time in either House or Senate, was it suggested that foster parents of voluntarily placed children would similarly have standing to initiate habeas proceedings.
2. Judicial Interpretation
Although Amendment A to Senate Bill 288 was introduced as a child-protective measure in connection with the licensure of relative foster placements, when published in the General Statutes, it appears as an addition to the general statute on habeas corpus. Since its enactment, it has been the subject of appellate court attention in a single case. In Orsi v. Senatore, 31 Conn. App. 400 (1993), a daughter-in-law of the plaintiffs herein, herself a foster mother for DCYS, brought a writ under this section to protest the proposed removal of a child committed to DCYS from her foster home to the home of his maternal grandmother. The court heard testimony for two days, at the end of which a determination was made that the Commissioners's proposed removal to the home of the child's grandmother was not an abuse of administrative discretion and vacated the temporary custody that had delayed the child's placement for a month. An appeal was taken not from that decision but rather from the Court's refusal to make a declaratory ruling on the constitutionality of certain DCYS regulations brought in the name of the child himself, the daughter-in-law acting as the child's self-appointed next friend in this claim for relief. In reversing and remanding the decision of the Appellate Court's reversed of the trial court's dismissal of this claim for relief, the Supreme Court, too, characterized § 52-466 (f) as a statute "...which confers standing upon foster parents to challenge a removal action by the department" Orsiv. Senatore, 230 Conn. 459, at 463 (1994).
3. Avoidance of Bizarre or Inconsistent Results:
While a cardinal principal of statutory interpretation is that a court may not go beyond the plain words of a statute, one of equal or greater impact is that statutory language may not be construed in a way which would produce a bizarre result or one inconsistent with the body of related law. (See e. g. In re 83-CD, 189 Conn. 276 (1983) narrowing the circumstances under which a child may be taken into temporary custody without a hearing; In Re Adrien C., 9 Conn. App. 506
(1986) interpreting the word "shall" as imposing a discretionary rather than mandatory duty to file extension petitions within a certain number of days; In Re Jessica M., 217 Conn. 459, 467ff (1991) removing the "no fault" ground from the termination law, notwithstanding plain language CT Page 9814 in the statute, in order to avoid an interpretation that would produce an unfair or unjust result to noncustodial parents following divorce.) It would be a bizarre result, indeed, if Alba were to lose her right to exercise guardianship over Julio because the proprietors of the institution in which he was placed voluntarily object to his removal to another placement approved not only by this mother but also by DMR and his court-appointed independent legal representative. Alba has never been found to have neglected her son; by acceding to the plans made for him by DMR she was found, five years ago, to be capable of meeting his specialized needs. The independent legal representative appointed by the court in connection with this litigation was specifically given the option of filing another uncared-for petition on behalf of Julio if it were deemed inconsistent with his best interests for him to be transitioned into another placement by DMR and approved by his mother. The Orsis' objection to moving Julio was not based on information unknown to those experts who designed, implemented and evaluated the proposed transition plan but rather on their prediction of his death if moved anywhere. Julio's legal representative, though aware of this prediction, was satisfied with the plan and declined to file a petition under § 46b-129. If a foster parent's prediction alone can oust a parent from the effective exercise of guardianship rights, then the various burdens of proof so scrupulously observed by the courts in other contexts — a preponderance of evidence where transfer of guardianship to DCF is at stake; clear and convincing evidence where parental rights may be terminated — are meaningless. Nullified, too, would be the preference accorded to parental custody in § 46b-59, and the costly obligation imposed on DCF to attempt efforts to reunify families following the placement of children in foster care AFTER custody has been removed from their parents.
Of even more bizarre consequence would be the dismantling of the system for caring for retarded children in this state, painstakingly worked out with the help of citizens' groups, law suits and court supervision. That system is premised on the voluntariness of the placement of retarded children with DMR when parents find they can no longer care for them at home, even with available community services. If "voluntary" is to have any meaning, it must mean that a parent may remove a child from a "voluntary" placement through DMR at will. If DMR has concerns that a proposed charged placement will be detrimental to the child, there are measures within DMR (§ 17a-274) or through DCF (§ 46b-129) to prevent harm to the child. The administrative hearing accorded to Julio himself, through his court-appointed legal representative, puts to rest any concern the erstwhile defendant Alfano may have had that the child has no way to question decisions jointly made by his parent and DMR. Section 17-210 (c) clearly gives a child the CT Page 9815 same right that his parent enjoys to an administrative hearing on the advisability of any change in placement by DMR. If the parents of all children currently placed voluntarily with DMR were to learn that changes in placement — even when approved by those parents — could be delayed for months and possibly even defeated by foster parents (or proprietors of residential facilities) who have provided care for over six months, the whole system so carefully arrived at for the care of these children would be dismantled. Had the legislators who passed Amendment A to Senate Bill 288 in 1988 been told that voluntary placements of retarded children with DMR would now be subject to review by foster parents through habeas proceedings, it is questionable that the measure would have passed.
It is true that a habeas action seeks only a judicial determination of what is in the child's "best interests" but the bringing of such an action and its ultimate resolution are extremely costly in terms of resources and time. In this case, the child's removal to a placement preferred by his mother and approved by DMR was delayed for eleven months, some of which time was properly used for the child's legal representative to obtain an evaluation and secure implementation of recommendations for improving the plan. But since the plan was modified and made ready to put into place in January of 1995, five more months elapsed before this two day hearing could be mounted. Had the court permitted the Orsis to call all 92 of their witnesses, it would have been many months more before Julio could be transitioned into a situation approved by his mother, his legal representation and DMR. This illustrates how mistaken were the predictions of the 1988 legislative staffs:
 The fiscal impact statement: "Allowing foster parents and other specified people to petition for child custody may involve an unknown number of court cases. This could result in potential costs to DCYS as the Department would have to participate in any court proceedings . . . The costs to the Judicial Department due to any increased workloads, however, are anticipated to be minimal and hence would be absorbed within the Department's operating budget.
Such expenditure may be appropriate in neglect cases where a child's custody and guardianship has been removed from parents and vested in DCF following an adjudication, by a preponderance of evidence, that the child is neglected or uncared-for. But when a child has never been removed from a parent's custody, such efforts and expenditures can only be destructive of existing safeguards to family integrity and would impose ". . . burdens on the legal system that may well outweigh the CT Page 9816 potential benefits." Newman v. Newman, 235 Conn. 82, 96 (1995).
4. Proprietors of mini-institutions may not be "foster parents"within the meaning of § 52-466 (f):
The defendants claim that proprietors of "Permanent Family Residences" licensed by DCF are not in the class of "foster parents" comtemplated by the statute. Because, for the reasons set forth above, the statute is deemed inapplicable to any caretaker of children placed voluntarily by a custodial parent, it is not necessry [necessary] to rule on this claim. Such a ruling would entail an extensive evidentiary hearing on the proportion of child care directly given by these proprietors as opposed to the extent they merely supervisers staff which provides such care, and might require a clinical evaluation of the child's perception of who is his principal caregiver.
B. There are no general principles of law which confer standing on these plaintiffs.
Custody of a child is no small thing. Unless specifically provided otherwise by statute, custodial parents have the right to make placement decisions for their child. Parents who make, or threaten to make, inappropriate decisions can find themselves respondents in actions brought by DCF (§ 46b-129) or DMR (§ 17a-274). These plaintiffs suggest that the mere fact that a child has been placed with an unrelated person for a long period gives that person a kind of custodial "adverse possession" of that child. But the plaintiffs do not assert any commmon-law right to initiate this habeas action, nor do they cite any other provision of statutory law that would give them standing to do so.
Whatever question on this point may have existed prior to 1987 was laid to rest in Nye v. Marcus, supra. In that case foster parents of an infant whose biological parents had consented to adoption brought a habeas action and secured a temporary injunction that stayed the child's proposed removal into an adoptive home by DCYS. The trial court granted the DCYS Motion to Quash on the ground that the Nyes lacked standing. The trial court also dissolved the temporary injunction and refused the Nyes' request for a stay of execution of the court' orders. Speaking for a unanimous Connecticut Supreme Court, Justice Callahan, acknowledging the court's concern with the child's best interest, did not permit that concern to overlook "the necessity that the Nyes have standing to bring petition for a writ of habeas corpus."198 Conn. at 141.
Standing focuses on whether a party is the proper party to CT Page 9817 request adjudication of the issues, rather than on the substantive rights of the aggrieved parties.
The court denied the Nyes standing, both as asserted in their own interest as foster parents and asserted derivately in the name of the child herself. The Nyes relied on Kearney v. State, 174 Conn. 244
(1978) in which foster parents were permitted to intervene in a custody suit involving their foster child. The Supreme Court distinguished that case in which the foster parents ". . . did not institute the suit but were merely permitted to intervene as defendants." Nye, supra at 143. Further, in that case the subject of standing had never been raised. Six years earlier, in Doe v. Doe, 163 Conn. 340 (1972) a long time stepfather brought a habeas action to determine custody and visitation with his stepchild. He was denied standing since he was neither the child's parent nor legal guardian, despite the extensive contact and emotional ties between child and stepfather. Subsequent to that decision the Connecticut General Assembly enacted § 46b-59 which specifically permits institution of actions for visitation by "any person . . . with respect to any minor child". But regarding instituting habeas proceedings the law was unchanged:
 . . . The Nyes do not have standing as foster parents to assert their own interest in the maintenance of their family relationship with Jennifer. They do not have a liberty interest and their emotional relationship with the child, which was acquired through the temporary foster placement, is too tenuous a basis to afford standing to institute a habeas corpus proceeding against the child's statutory parent and legal guardian. Nye, supra at 144.
Just as the enactment of § 46b-59 rectified by statute the lack of standing to initiate petitions for visitation by unrelated persons at common law, so the enactment of § 52-466 (f) conferred by statute standing on foster parents of children placed by DCYS where no common law standing had been recognized. The latter enactment, however, did not confer standing on foster parents of children placed voluntarily by parents who have never relinquished or been deprived of legal custody or guardianship. Should the General Assembly, in some subsequent session, address this issue and decide to broaden the scope of §52-466 (f) to cover "any person other than a foster parent", as was suggested and discarded in the 1988 session, it is free to do so. At this time however, but for the specific grant of standing to foster parents of children in the legal custody of DCF, enacted as Amendment A to Senate Bill 288 (P.A. 88-332), the law as enunciated by the Nye
court still remains in effect. Considerations of public policy CT Page 9818 regarding the voluntary placement of retarded citizens militates against any broader interpretation of the 1988 statutes. See Weidenbacher v.Duclos, 234 Conn. 51, 70-73 (1995).
C. They may not assert rights, derivatively, of Julio S.
In the original writ, Charles Alfano, whose connection with Julio S. has never been explained, was the party plaintiff who styled himself Julio's "next best friend", asserting rights that Julio would assert for himself if he were able. While the Orsis do not characterize themselves as Julio's "next best friend" or "prochain ami", they appear, like Alfano, to be seeking "to enforce rights guaranteed to Julio under the Constitution. . . ." Insofar as they seek to assert Julio's interests, by the time of the hearing on May 4 and 5 of 1995, that assertion cannot stand.
1. Charles Alfano was the original "next friend" of Julio. There appears no necessity for more than one such "next friend" to be self appointed.
2. From the outset of this litigation, the court appointed an attorney and guardian ad litem for Julio. Considering Julio's age and incapacities, a single legal representative was clearly appropriate.Newman v. Newman, 234 Conn. 82, 96-97 (1995). The attorneys at Hartford Legal Aid who received this appointment are disinterested, experienced legal representatives for the child quite capable of asserting Julio's rights, Constitutional or otherwise. "When a guardian has been appointed to protect the interests of a child, the guardian is usually the proper person to bring an action on behalf of the child. Williamsv. Cleaveland, 76 Conn. 426, 434 (1904)." Orsi v. Senatore, 230 Conn. 459,467 (1994). There are no "exceptional circumstances" here permitting suit by a self-appointed next friend, such as the absence or unwillingness or inability of the guardian to act for the child.Cottrell v. Connecticut Bank and Trust Company, 175 Conn. 257, 263
(1978). The court appointed legal representative for Julio, acting as both his counsel and his guardian ad litem, was very present, willing and able to act for the child, and did, in fact, act for him in seeking an administrative review and modification of the proposed transition plan.
3. Even, if no other appropriate attorney and guardian ad litem had been appointed, the Orsis would not be regarded as "proper or suitable persons" to make claims on behalf of the child. Newman v.Newman, 235 Conn. 82, 95 (1955) Having provided him with excellent physical care for nearly all his life, they are understandably CT Page 9819 emotionally attached to him; they are currently under investigation for alleged mistreatment of foster and adoptive children and their license to continue as a Permanent Foster Residence is in jeopardy of revocation; removal of Julio would result in a loss of considerable income to Domus Amorus, in addition to the loss of foster care payments suffered when the two children in DCF custody were removed; five years ago the Orsis attempted to have Alba's parental rights terminated and their pleadings in the current litigation suggest their continuing negative view of her ability to meet his needs and her motivations in seeking his return. Nowhere have they conceded that, particularly considering his limited life expectancy, it might be advantageous for Julio to live in proximity to his mother and siblings for the final portion of his life:
 Any assessment of the child's alleged deprivation must take into account not only what he has lost but what he has received in return." Smith v. O.F.F.E.R., 431 u. s. 816, 857 (1977) cited in Nye supra at 145.
IV. Even if deemed to have standing, the Orsis offered insufficientevidence that the placement decision of Julio's mother, endorsed by DMRand his legal representative, was inconsistent with his best interests.
Conceding that only eight of the 92 witnesses the Orsis intended to call were able to testify in the day and one-half allotted to them, guardianship without any prior showing of unfitness. Since none of the plaintiffs' witnesses could envision any successful way to transition Julio into his mother's home, or into a placement proximate to her home, at any time in the future, such removal of custody would amount to a de facto termination of her parental rights with none of the heavy incrustation of constitutional and statutory safeguards accorded to parents in jeopardy of the permanent loss of those parental rights.
V. Conclusion and Orders
Since the Orsis lack standing to pursue this writ, the Motion to Quash is granted and the matter dismissed. Since, even if found to have standing they would be unable to offer proof that the carefully designed transition plan devised and executed by DMR and approved both by Julio's custodial parent and by his court-appointed guardian ad litem is inconsistent with all of his best interests, the temporary injunction imposed on June 28, 1994 may not be further continued pending the anticipated appeal from the ruling on the Motion to Quash. Julio's mother has had to wait four months after the transition plan was fully implemented, pursuant to suggestions made by the expert retained by CT Page 9820 Julio's guardian ad litem, to have her son join his two sisters and large extended family in Willimantic. They should not have to wait longer.
THEREFORE The Motion to Quash is granted and the temporary injunction is dissolved. Alba is restored to her position as the child's custodian and guardian, and may exercise her rights as such to make plans for her son, so long as those plans have the approval of DMR and the child's legal representative.